# In the United States Court of Federal Claims

Nos. 16-1602C & 17-88C (not consolidated)

(Filed Under Seal: March 31, 2017)

(Reissued: April 7, 2017)

| | | |
|---|---|---|
| **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** | ) | |
| | ) | Bid-protests; challenges to corrective |
| **JACOBS TECHNOLOGY INC.,** | ) | action; jurisdiction; standing; ripeness; |
| | ) | mootness; validity of the agency's |
| **Plaintiff,** | ) | decision to take corrective action; |
| | ) | inadequacy of showing to support |
| **v.** | ) | discovery into alleged bias |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **TRAX INTERNATIONAL CORPORATION,** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |
| _____ | ) | |
| | ) | |
| **TRAX INTERNATIONAL CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **JACOBS TECHNOLOGY INC.,** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |
| | ) | |
| **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** | | |

Robert J. Symon, Bradley Arant Boult Cummings LLP, Washington, D.C., for plaintiff and defendant-intervenor Jacobs Technology Inc.  With him on the briefs and at the hearings were Elizabeth A. Ferrell and Aron C. Beezley, Bradley Arant Boult Cummings LLP, Washington, D.C.

Amy L. O'Sullivan, Crowell & Moring LLP, Washington, D.C., for plaintiff and defendant-intervenor TRAX International Corporation.  With her on the briefs and at the hearings were James G. Peyster and Robert J. Sneckenberg, Crowell & Moring LLP, Washington, D.C.  Also with her on the briefs was Olivia L. Lynch, Crowell & Moring LLP, Washington, D.C.

Robert C. Bigler, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Chad A. Readler, Acting Assistant Attorney General, Civil Division, Benjamin C. Mizer, former Principal Deputy Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Steven J. Gillingham, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington D.C.  With him at the hearings was Evan Williams, Attorney, United States Army.

## OPINION AND ORDER[1]

LETTOW, Judge.

These bid protests address a procurement that has spanned years and has proved to be refractory and intricate.  A solicitation by the United States ("the government"), acting by and through the United States Department of the Army ("Army" or "agency"), was initiated in 2013 for a mission-test, support-services contract at the United States Army Yuma Proving Ground ("Yuma") in Arizona.  On September 10, 2014, the Army awarded the contract to Jacobs Technology Inc. ("Jacobs") after a procurement process that extended over approximately sixteen months.  TRAX International Corporation ("TRAX"), the incumbent contractor at Yuma and another offeror in the procurement, protested the award at the Government Accountability Office ("GAO").  Before GAO rendered a decision, the Army took corrective action and reopened discussions with offerors.  The Army awarded the contract to Jacobs a second time in December 2015, but it renewed corrective action after TRAX again protested the award at GAO. The Army awarded the contract to Jacobs for a third time in October 2016, which TRAX also protested at GAO.  In November 2016, the Army decided to take corrective action for a third time, stating that it would reevaluate final proposals and make a new source selection decision. The Army concluded that a third round of corrective action was warranted because (1) Jacobs violated the solicitation by altering its oral presentation slides without making a new oral presentation, and (2) TRAX proposed a staffing baseline that deviated from the baseline in the solicitation.

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the United States Court of Federal Claims ("RCFC") and the protective orders entered in these cases, it was initially filed under seal.  The parties were requested to review this decision and provide proposed redactions. The resulting redactions are shown by brackets enclosing asterisks, *e.g.*, "[***]."

Jacobs and TRAX have each filed suit in this court to challenge the Army's most recent corrective action, presenting diametrically divergent claims and seeking different relief. Jacobs challenges the Army's decision to take corrective action and contends that the Army's corrective action has an overly broad scope and is arbitrary and capricious. Jacobs seeks a permanent injunction enjoining the Army from proceeding with the corrective action, thus allowing Jacobs to receive the third contract award. In contrast, TRAX brings a bias claim against the Army on the ground that the procurement officials have demonstrated favored treatment of Jacobs, as evidenced by the three successive awards Jacobs has received and by the agency's failure to enforce a common baseline for the offerors' staffing proposals, which allegedly has benefited Jacobs and prevented TRAX from participating in a fair competition. TRAX contends that the corrective action is not sufficiently broad and requests that the court issue an injunction directing the Army to either (1) appoint new, unbiased procurement officials, or (2) cancel the solicitation and resolicit revised proposals under fair terms.

Pending before the court are the parties' cross-motions for judgment on the administrative record in *Jacobs* and TRAX's motion for discovery and the government's motion to dismiss in *TRAX*. For the reasons stated, Jacobs' motion for judgment on the administrative record is denied, the government's and TRAX's cross-motions for judgment on the administrative record in *Jacobs* are granted, TRAX's motion for discovery is denied, and the government's motion to dismiss TRAX's complaint is granted for failure to state a claim upon which relief can be granted.

## FACTS[2]

### A. *Mission Test Support Services at the Army Yuma Proving Ground*

The Yuma Proving Ground is an Army facility located in Arizona. AR 3a-210.[3] Yuma's primary mission is to provide "the most flexible, responsive, innovative and diverse set of capabilities and services across the spectrum of natural environments." AR 3a-213. It tests military equipment of varying types, with the materials tested and the "associated infrastructure

---

[2]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement filed pursuant to RCFC 52.1(a). *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (explaining that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

[3]Separate administrative records were filed by the government in *Jacobs* and *TRAX*. In this opinion, citations to the administrative record refer to the record as filed on February 13, 2017 in *TRAX*, No. 17-88C. The administrative record in *TRAX* contains every tab and page from the administrative record in *Jacobs*, No. 16-1602C, including identical numbering, but the record in *TRAX* also contains an additional 18 tabs pertaining to the procurement at issue. *See* AR Tabs 120-37.

The record is divided into tabs and paginated sequentially. In citing to the administrative record, the court will first designate the tab, followed by the page number. For example, AR 3a-210 refers to tab 3a, page 210 of the administrative record.

necessary to conduct each test chang[ing] constantly." AR 3-97. The Army describes Yuma as a "premier Army asset" with capabilities that are continually expanding, resulting in an increased need for personnel to support the testing conducted at the facility. AR 3a-213.

On May 16, 2013, the Army issued a Request for Proposals ("RFP"), solicitation number W9124R-13-R-0001, regarding a contract for "Mission (Test) Support Services" at Yuma. AR 3-96 to -97. The RFP contemplated the award of a single "Cost-Plus-Award-Fee" contract with a firm-fixed-price for a two month phase-in performance period, "a one-year base period of performance from the [first] day of full contract performance, and three one-year option periods, if exercised." AR 3-108. The contractor would "provide personnel, management, and any other items and services not government furnished to perform the services defined in th[e] Performance Work Statement." AR 3a-213.[4] The contractor's obligations would primarily relate to providing specialized personnel and support for military testing. *See* AR 30-3206.

The Army amended the RFP six times between May 23, 2013 and February 12, 2014 before making a contract award. *See* AR Tabs 4 to 8, 23. In amendment 6, the RFP provided for a "best value source selection" where the Army would "select the best overall offer" based upon four factors: "[m]ission [c]apability, [p]ast [p]erformance, [s]mall [b]usiness [p]articipation, and [c]ost." AR 23-2631. The procurement was to "be conducted using a two-phase process," consisting of an evaluation of (1) organizational conflicts of interest, and (2) the four factors listed above. *See* AR 23-2614. The mission capability factor was "significantly more important" than the past performance factor, which in turn was "more important" than the small business participation factor. AR 23-2632. The first three factors combined were "approximately equal to cost." *Id.* The mission capability and cost factors are the pertinent factors at issue in these bid protests.

*1. The mission capability factor.*

The Army's evaluation of the mission capability factor would "consist of an assessment of the offeror's proposed [s]trategic [p]erformance [p]lan," which would be "evaluated based [upon] the offeror's understanding and explanation of how it w[ould] partner with the [g]overnment to help resolve future strategic issues as identified by [Yuma] senior leadership, support [Yuma]'s stated objectives for this acquisition[,] and bring value to the [Yuma] mission." AR 23-2633. The factor included four sub-factors:

(a) Management and Organization Approach
(b) Personnel Management Approach
(c) Quality Control and Continuous Process Improvement Approach
(d) Technical Expertise

---

[4]These services included "10 major functional areas:" operation and maintenance of electronic instrumentation devices; operation of optical, meteorological, and geodetic instrumentation; operation and maintenance of environmental simulation test equipment; computation and automation of data; operation and maintenance support for testing operations; management of ammunition operations; performance of technical and engineering services; operation of range management; operation of communication and information management; and operation of data acquisition and management. AR 3a-213 to -16.

*Id.* Each offeror would receive one of five technical ratings for the mission capability factor: "Outstanding," "Good," "Acceptable," "Marginal," or "Unacceptable." AR 23-2636 to -37. An offeror's rating for the mission capability factor would be based upon the offeror's ratings for the four sub-factors. AR 23-2634. To be eligible for the contract award, the RFP required each offeror to achieve a minimum rating of "Acceptable" for each sub-factor; a "Marginal" or "Unacceptable" rating for any single sub-factor would be applied to the mission capability factor and render the offeror ineligible. *Id.* Additionally, each offeror would receive a mission capability risk rating of "Low," "Moderate," or "High." AR 23-2637.

2. *The mission capability oral presentation.*

In addressing the mission capability factor, offerors would submit both "a limited written proposal and an oral presentation." AR 23-2620. The RFP described the format for the oral presentation:

> Oral Presentation: Offerors shall prepare and present an oral presentation that addresses Mission Capability. An overhead projector, a video projector and a screen will be available for the offerors' use. Offerors will have three hours to present their Mission Capability approach. There is no limit to the number of slides permitted, however presentations must be completed in the three hour timeframe allotted. Content on slides submitted, but not briefed in the presentation, will not be considered in the evaluation. . . . The successful offeror's presentation video will represent the Mission Capability submission and will be accepted in its entirety. If offerors desire a copy of the video they must provide a copy of the video media specified by the [g]overnment at the time that the presentation is scheduled. A clarification session will be held following the presentation to allow the [g]overnment to clarify any areas of uncertainty that the [g]overnment may have in reference to the presentation. This session is not considered negotiations and proposal changes will not be allowed or requested during this session. The offeror[']s presentation team shall not exceed six personnel, one of which must be the proposed on-site Program Manager. The Program Manager is expected to lead the presentation.

AR 23-2622. Offerors would submit oral presentation slides by separating the slides into five general tabs, including an executive summary and information related to each of the four sub-factors within the mission capability factor. *See* AR 23-2620 to -22. The RFP stated that each offeror would address the first sub-factor (Management and Organization Approach) "in the written proposal and presentation materials," AR 23-2621, the second (Personnel Management Approach) and third (Quality Control and Continuous Process Improvement Approach) sub-factors "in the oral proposals only," AR 23-2622, and the fourth sub-factor (Technical Expertise) "in written format only," *id.*

3. *Baseline staffing under the mission capability and cost factors.*

Under the management and organization sub-factor within mission capability, each offeror was instructed to "provide a staffing plan that addresses the organizational structure of the [o]fferor's proposed team." AR 23-2621. The RFP specified:

> The [o]fferor shall provide a staffing matrix for first line supervisors and
> subordinate employees for each functional area.  The matrix shall depict the
> number of [f]ull[-t]ime [e]quivalent[ employees] (FTEs), [and] productive hours
> by labor category, skill level, and skill type of employment for each functional
> area. . . .

*Id.*  The Army provided historical staffing information at Yuma in Technical Exhibit 10, item 6,
which was attached to the original RFP.  *See* AR 3b-404 to -08.  This exhibit showed 1,234
historical staff under a column titled "Count of Job Title," *see id.*, which represented the number
of full-time equivalents needed for the baseline period of the Yuma procurement, *see* AR 5b-
454; AR 134-13505.[5]  A single full-time equivalent would represent "the productive hours
required by a single person for one year," minus non-productive hours."  AR 130-13483.[6]  The
RFP requested that each offeror use the historical staffing data in Technical Exhibit 10, item 6
"as a baseline (excluding management and administrative staff) for developing proposed labor
costs."  AR 23-2629.  Any offeror deviating from the baseline would need to explain and justify
the divergence:

> Deviations from this baseline based on the offeror's unique management approach
> and promised efficiencies, shall be fully explained and justified, in the Cost
> Rationale Section, keeping in mind that the [g]overnment is interested in a
> management approach that will result in continuous improvements and
> efficiencies that are expected to be reflected in the management and cost
> proposals.

*Id.*

## B.  *The First Award and Ensuing Corrective Action*

The Army received proposals from four offerors: InDyne, Jacobs, ManTech
International, Inc., and TRAX, the incumbent contractor.  AR 30-3208 to -11.  Jacobs and TRAX
received the highest ratings for mission capability, with [***].  AR 30-3208.  [***].  *Id.*
However, Jacobs' total proposed cost of $306,527,268 was lower than TRAX's total proposed

---

[5]The 1,234 full-time equivalent historical staff only related to the baseline period of the
contract; the Army acknowledged that it could not provide "forecasted" full-time equivalent staff
for subsequent periods.  *See* AR 5b-457.  However, the Army indicated that it had provided
"historical and current staffing levels" to aid in the offerors' labor estimates for the contract
periods beyond the baseline.  *Id.*  Technical Exhibit 10, item 4 provided an historical year-by-
year summary of staffing levels, *see* AR 3b-402, while Technical Exhibit 10, item 6 set out
detailed staffing information by position for the most recent year, *see* AR 3b-404 to -08.

[6]A single full-time equivalent worker was assumed to be available for 2,080 hours per
year, constituting 40 hours multiplied by 52 weeks, which time was to be adjusted based upon
the offeror's "individual management approach and efficiencies."  *See* AR 104-8720; AR 130-
13483.  The relationship between staffing and full-time equivalents is not necessarily one to one
because, for example, the work of several part-time staff might combine to equal the work of one
full-time equivalent.  *See* AR 130-13483.

cost of $[***].  *Id.*  Jacobs' total evaluated probable cost/price of $411,678,388 was also lower than TRAX's total evaluated probable cost/price of $[***].  *Id.*

In June 2014, before the first contract award, two procurement officials on the "Cost Team" issued a clarification to the Source Selection Advisory Council to explain the "significant variance in cost" between the two highest-rated offerors, Jacobs and TRAX.  *See* AR 124-13126 to -36.  The Army attributed the variance to a "[p]roblem" it found with the historical baseline staffing data provided in Technical Exhibit 10, item 6, specifically noting that the data did not include productive hours, average wage rates, or full-time equivalents.  AR 124-13127.  Thus, when Jacobs and TRAX submitted baseline staffing proposals, they took different approaches. Jacobs and TRAX each provided a baseline number of total labor hours that would be expended in the base period of the contract.  *See* AR 124-13128.  Both Jacobs and TRAX also calculated the baseline total labor hours for the first year by multiplying (1) average productive labor hours per employee and (2) 1,234 employees, the figure provided in Technical Exhibit 10, item 6.  *See id.*  However, for the first prong of the equation, Jacobs' productive labor hours per employee was [***], whereas TRAX's productive labor hours per employee was [***].  *See id.*  As a result, before either offeror applied any labor efficiencies that could reduce the offeror's proposed hours, Jacobs proposed [***] total baseline hours and TRAX proposed [***] total baseline hours for the base period.  AR 124-13132.  This baseline number affected the cost of the proposals.  *See id.*  Additionally, Jacobs [***], AR 124-13129, and [***], AR 124-13131 to -32.  TRAX [***].  AR 124-13132.

Despite the different approaches, the Army determined that even if TRAX and Jacobs had proposed the same number of hours, whether through Jacobs' or TRAX's method, Jacobs would still have proposed a lower cost.  AR 124-13133.  The Contracting Officer thus found that Jacobs presented "the lowest priced offer of the most highly rated proposals," AR 31-3219, and the Source Selection Authority ("SSA") determined that Jacobs' proposal "provide[d] the best overall value," AR 30-3206.  TRAX's proposed cost was deemed "unreasonable."  AR 31-3219. Accordingly, on September 10, 2014, the Army awarded the contract to Jacobs.  AR 32-3220.

After receiving notice of the contract award and a post-award debriefing, *see* AR Tabs 31, 34, TRAX timely filed a protest of the award at GAO on September 22, 2014, AR Tab 35, and followed with supplemental protest grounds on November 3, 2014, *see* AR Tab 127.  TRAX raised a number of protest issues, including allegations related to organizational conflicts of interest, unlawful discussions, the Army's failure to evaluate proposals on a common staffing baseline, and the Army's flawed cost realism analysis.  *See generally id.*  Shortly thereafter, on November 14, 2014, the Contracting Officer "determined that corrective action related to this acquisition [was] warranted in light of TRAX's supplemental protest grounds" and that corrective action "would better serve the procurement process."  AR 37-3387.  The Army stated that it would "open discussions with all offerors and render a new Source Selection Decision after evaluation of revised proposals."  *Id.*  GAO subsequently dismissed TRAX's protest because the Army's corrective action "render[ed] the protest academic."  AR 38-3388.

### C.  The Second Award and Ensuing Corrective Action

After the Army reopened discussions, InDyne, Jacobs, and TRAX submitted revised proposals and were given technical ratings by the Army.  AR 60-5881.  Jacobs and TRAX [***], but Jacobs submitted lower costs than TRAX for total proposed cost and total evaluated probable

cost/price.  *Id.*  As with the first award evaluation, a procurement official on the Cost Team issued a clarification to the Source Selection Advisory Council to explain the variance in Jacobs' and TRAX's costs.  *See* AR Tab 130.  That clarification identified the same baseline staffing issue related to Technical Exhibit 10, item 6, and indicated that Jacobs and TRAX had again applied different methodologies to determine baseline staffing for the base year, resulting in a lower baseline of labor hours for Jacobs.  *See* AR 130-13480 to -88.[7]  Nonetheless, the SSA found that Jacobs' proposal "provide[d] the best overall value" based upon an evaluation of the four factors described in the RFP, AR 60-5876, and the Army awarded the contract to Jacobs for a second time on December 10, 2015, AR Tab 63.

TRAX received notice of the contract award and a post-award debriefing, *see* AR Tabs 64, 66, and timely filed a protest of the award decision at GAO on December 21, 2015, AR Tab 68.  TRAX's protest included, among other grounds, an allegation that the Army failed to correct the common-staffing baseline issue.  *See* AR 68-6042 to -55.  The parties then engaged in outcome prediction alternative dispute resolution, where a GAO attorney reportedly stated that GAO "would likely sustain" TRAX's protest because the Army failed to evaluate proposals on a common labor-hour baseline.  *See* AR 134-13505.  Subsequently, on March 17, 2016, the Contracting Officer "determined that corrective action . . . was warranted in light of TRAX's protest ground that the [a]gency failed to ensure that offerors were competing against a common baseline of requirements."  AR 70-6099.  The Contracting Officer further stated:

> The corrective action will open discussions, provide all offerors the opportunity to submit a revised [c]ost/[p]rice proposal[,] and advise offerors to craft their staffing proposals against the 1,234 [full-time equivalent] [b]aseline [s]tarting [p]oint in [Technical Exhibit] 10, [i]tem 6.  Additionally, . . . any proposed deviation from this baseline based on the offeror's unique management approach and promised efficiencies must be fully explained and justified in the Cost Rationale Section.  The [a]gency shall evaluate the revised cost proposals and . . . render a new Source Selection Decision after evaluation of proposals.

*Id.*  As a result, GAO dismissed TRAX's protest as academic.  *See* Def.'s Resp. to Pl.'s Mot. for Judgment on the Administrative Record and Def.'s Cross[-]Mot. for Judgment on the Administrative Record ("Def.'s Cross-Mot.") at 6, No. 16-1602C, ECF No. 47.

In implementing the second corrective action, the Army initially issued amendments 7 and 8 to the RFP on May 12, 2016 and June 2, 2016, respectively.  AR Tabs 71, 72.  Those amendments related to a collective bargaining agreement, wage determinations, and baseline staffing data.  *See* AR 71-6101 to -02; AR 72-6104 to -05.  TRAX and Jacobs each filed pre-award protests at GAO, challenging specific aspects of the amended RFP.  *See* Def.'s Cross-Mot.

---

[7]On April 29, 2015, after taking its first corrective action, the Army questioned whether Jacobs' previously-reported [***] productive hours per employee were realistic.  AR 40-3394.  On May 12, 2015, Jacobs responded by stating that it had relied on a baseline of 1,234 full-time employees and expressing its support for "the [g]overnment's need to evaluate cost using a common initial baseline."  AR 43-3413.  Jacobs also defended its baseline-hour approach in Volume IV of Jacobs' final proposal revision, sent on August 10, 2015.  *See* AR Tab 52; AR 52d.1-4705 to -06.

at 7.  The Army subsequently issued amendment 9 to the RFP on June 30, 2016, which deleted amendments 7 and 8 in their entirety but did not affect amendments 1 through 6.  AR 73-6117 to -18.  Amendment 9 addressed a new collective bargaining agreement, revised wage determinations, and updated cost data.  *See* AR 73-6118; AR 74a-6120.  On that same day, the Army notified Jacobs and TRAX that it was "reopening discussions with offerors in the competitive range and requiring: 1) revised and complete cost proposals and 2) updated O[rganizational ]C[onflict of ]I[nterest] submissions and 3) responses to E[valuation ]N[otice]s, if any."  AR 74a-6120, AR 75a-6189.  As a result, TRAX withdrew its pre-award protest and GAO dismissed Jacobs' pre-award protest as academic.  *See* Def.'s Cross-Mot. at 7.

In providing notice to Jacobs and TRAX, the Army specified:

> The [s]olicitation required offerors to provide hard copies of their oral presentation briefings with their initial limited written Mission Capability submission.  Since the [performance work statement] and labor categories in [Technical Exhibit] 10, [i]tem 6 remain unchanged and offerors provided oral presentations based on [Technical Exhibit] 10[,] [i]tem 6, it is not anticipated that revisions to other proposal volumes (Mission Capability, Past Performance, Small Business Participation) are necessary.  However, if an offeror chooses to submit revisions to another proposal volume, change-out pages shall be submitted in blue paper and shall contain a vertical line in the right margin annotating the specific paragraph/sentences revised.  [Offerors] shall also: [1]) identify each item revised; 2) provide the associated solicitation and proposal paragraphs; and 3) provide an explanation/rationale for the revision. . . .  Proposal revisions will be evaluated in accordance with the evaluation criteria in the [s]olicitation and may result in changing current evaluation scores.  This includes evaluation of oral presentations discussing revisions to Volume I, Mission Capability.

AR 76a-6262.  Additionally, if an offeror submitted changes to its oral presentation slides, "an oral presentation briefing [would be] required to have the slides considered."  AR 77b-6272.  If necessary, the offerors would provide their oral presentations on July 21, 2016.  AR 77c-6275.

### D.  The Third Award and Ensuing Corrective Action

#### 1.  Jacobs' oral presentation slides.

In accord with the Army's second round of corrective action, Jacobs and TRAX submitted revised proposals.  AR 104-8708.  Prior to submitting its proposal, however, Jacobs stated in an e-mail to the Army, dated July 14, 2016, that it would not be revising its oral presentation slides or requesting an oral presentation.  AR 114-8933.[8]  On July 20, 2016, Jacobs submitted its revised proposal, and that submission included a summary of leadership changes at

---

[8]Prior to the second corrective action and third evaluation process, Jacobs had complied with the RFP by submitting oral presentation slides and making an oral presentation.  *See* Pl.'s Reply in Support of its Mot. for Judgment on the Administrative Record and Opp'n to Defs.' Cross-Mots. ("Jacobs' Opp'n to Cross-Mots.") at 3, No. 16-1602C, ECF No. 51.  The court's discussion focuses, however, on events occurring during the third award process.

the company, an updated organizational conflict of interest submission, a revised cost proposal, and a revised staffing plan. *See* AR 78-6279. Jacobs stated that it "chose[] not to submit changes to other proposal volumes as any updates [it] could make would not have a material or significant impact on [its] proposed approach – or the execution of that approach – for performing the [mission test support services] work." *Id.* Jacobs also noted that it was no longer working with a particular subcontracting company, [***], and that it had made "minor change[s]" to its organization and key personnel, but concluded that such changes were "not worthy" of submitting "change pages." AR 78-6279 to -80.

Notwithstanding that disclaimer, on September 23, 2016, Jacobs submitted a second revised final proposal to reflect updates to the mission capability and small business participation factors. AR 118-9939. Jacobs stated that such updates were "minor" and had been made "to ensure consistency across" the factors. *Id.* Jacobs also provided a matrix detailing the changes, which indicated that Jacobs altered many of its oral presentation slides. *See* AR 118-9939 to -40. The changes included updates to Jacobs' organization chart, removal of [***] from Jacobs' contracting team, updates to key personnel, and updates to its "cost reduction metric," among other changes. *See id.*; *see also* AR Tab 118a.1.

2. *The Army's evaluation of the offerors' baseline staffing and proposals.*

After Jacobs and TRAX submitted their final proposals, [***]. AR 104-8708.[9] Significantly, Jacobs again submitted a lower cost than TRAX for total evaluated probable cost/price. AR 104-8720. As before, Jacobs proposed a lower number of baseline productive hours for the first year of the contract. *Compare* AR 78b-6471 (listing Jacobs' baseline productive labor hours as [***]), *with* AR 117a-9654 (listing TRAX's baseline productive labor hours as [***]). Jacobs and TRAX applied overtime hours differently, with Jacobs [***], *see* AR 78b-6458, and TRAX [***], *see* AR 117a-9654. [***]. AR 116a-8944. The SSA acknowledged Jacobs' and TRAX's different approaches regarding overtime, but found that both Jacobs and TRAX had complied with the RFP by beginning with 1,234 full-time equivalents and then applying management approaches and efficiencies to determine baseline staffing. AR 104-8720. The SSA further determined that Jacobs offered [***], and ultimately found that Jacobs' proposal presented the best overall value. *See id.* On October 28, 2016, the Army awarded the contract to Jacobs for a third time. AR 108-8782.

3. *The Army's third corrective action.*

TRAX received notice of the third award, AR Tab 107, and timely filed a protest of the award decision at GAO on October 31, 2016, AR Tab 111.[10] TRAX supported its protest by alleging that Jacobs had deviated from the required staffing baseline and improperly failed to

---

[9]Jacobs also received a "[***]" rating for the past performance factor and a "[***]" rating for the small business participation factor, whereas TRAX received ratings of "[***]" and "[***]" for those two factors, respectively. AR 103-8700.

[10]TRAX received a debriefing letter from the Army, which explained the award decision and disclosed Jacobs' technical ratings and proposed cost/price to TRAX. AR 110-8812 to -13.

conduct a new oral presentation, among other grounds.  *See* AR 111-8841 to -52.[11]  That same day, the Army issued a stop-work order to Jacobs pursuant to 48 C.F.R. ("FAR") § 52.233-3, pending resolution of TRAX's protest.  AR 112-8928.  On November 15, 2016, Jacobs filed suit in this court, alleging that the Army's failure to override the stay of contract was "unlawful, arbitrary, capricious, and an abuse of discretion."  Compl. ¶ 5, *Jacobs Tech. Inc. v. United States*, No. 16-1513C.  Shortly thereafter, on November 29, 2016, the Army announced that it was taking corrective action to "better serve the procurement process."  AR 113-8929.  Specifically, the Army stated that it would be reevaluating the final revised proposals of Jacobs and TRAX and making a new source selection decision.  *Id.*  The next day, the Army provided the following rationale for its decision:

> Despite Jacobs' representation that its oral slides would not change, Jacobs in fact submitted revised oral slides in its final revised proposal dated 23 September 2016. . . .  The revisions were numerous and substantive in nature.  Moreover, Jacobs' failure to provide a new oral presentation deprived the Army from asking questions during the clarification session as contemplated by the [s]olicitation.

> Importantly, the Army relied upon these un-briefed slide revisions in its technical evaluation of Jacobs' proposal wherein it rated Jacobs as 'Outstanding' under the mission capability factor.  Consequently, the Army's evaluation was not in accordance with the [s]olicitation, as amended, and must be corrected.

> Additionally, TRAX proposed an adjusted baseline that deviated from the baseline in the RFP instruction – which runs the risk of another GAO sustainable protest issue.

AR 114-8933.  GAO then dismissed TRAX's protest as academic, AR Tab 115, and Jacobs voluntarily dismissed its protest in this court, No. 16-1513C, ECF No. 29.

### E.  Jacobs' and TRAX's Competing Protests in This Court

On December 2, 2016, Jacobs filed its present suit in this court to challenge the Army's third corrective action.  *See generally* Jacobs Compl.  Jacobs alleges that the Army's decision to take corrective action (Count I) and the overly broad scope of that corrective action (Count II) were arbitrary and capricious.  *See* Jacobs Compl. ¶¶ 21, 23.  For relief, Jacobs seeks a "permanent injunction enjoining the [a]gency from proceeding with" the corrective action, thus allowing Jacobs to receive the third contract award.  *See* Jacobs Compl. at 9.[12]  The court granted

---

[11]TRAX also filed a supplemental protest on November 4, 2016, alleging an organizational conflict of interest regarding the award to Jacobs.  Jacobs Compl. ¶ 15.

[12]In its complaint, Jacobs also requested that the court issue a temporary restraining order and a preliminary injunction to prevent the Army from moving forward with the corrective action.  Jacobs Compl. at 9.  At a status conference held shortly after Jacobs' protest was filed, Jacobs stated that it no longer needed such relief at that time because the government had agreed not to make a contract award until March 2017.  Hr'g Tr. 4:1-6 (Dec. 7, 2016), No. 16-1602C. Accordingly, the court denied Jacobs' application for a temporary restraining order and motion for preliminary injunction "without prejudice to a renewal if circumstances change."  Order of Dec. 7, 2016, No. 16-1602C, ECF No. 22.

TRAX's motion to intervene as a defendant-intervenor. Order of Dec. 5, 2016, No. 16-1602C, ECF No. 12. The court also established a schedule for filing the administrative record and for filing and briefing motions and cross-motions on the administrative record. Scheduling Order of Dec. 7, 2016, No. 16-1602C, ECF No. 23.

On January 18, 2017, TRAX filed suit in this court regarding the same procurement, alleging bias in its first and only Count. *See* TRAX Compl. ¶¶ 66-67. TRAX alleges that Jacobs has improperly deviated from the staffing baseline in all three of its contract proposals, TRAX Compl. ¶¶ 2-3, and that the Army's failure to enforce a common baseline indicates bias and has unfairly disadvantaged TRAX, *see* TRAX Compl. ¶¶ 4-5. Accordingly, TRAX requests that the court issue an injunction directing the Army to (1) appoint new, unbiased procurement officials to perform a fresh evaluation in a fair manner that is in accord with the RFP, or (2) cancel the solicitation, resolicit revised proposals under terms that establish fixed staffing levels for cost evaluation, and generally "ensure a level playing field." TRAX Compl. at 34-35. In requesting installation of new procurement officials, TRAX requests that the Army "appoint a new Contracting Officer, Cost/Price Analyst, S[ource ]S[election ]A[uthority], and any other M[ission ]I[nstallation ]C[ontracting ]C[ommand] personnel who are advisors or officials" for the Yuma procurement. TRAX Compl. at 34.[13] The court granted Jacobs' motion to intervene in TRAX's case as a defendant-intervenor. Order of Jan. 23, 2017, No. 17-88C, ECF No. 12. Additionally, in accord with the parties' requests at a status conference held on January 26, 2017, the court set a briefing schedule for TRAX to request discovery on the allegations, for the government and Jacobs to respond to that request, and for the government to file a motion to dismiss. Scheduling Order of Jan. 27, 2017, No. 17-88C, ECF No. 26. The government filed the administrative record in TRAX's case on February 13, 2017.[14]

The parties' cross-motions for judgment on the administrative record in *Jacobs* have been submitted and fully briefed and were addressed at a hearing on February 9, 2017. *See* Pl.'s Mot. for Judgment on the Administrative Record and Mem. in Support ("Jacobs' Mot."), No. 16-1602C, ECF No. 41; Def.'s Cross-Mot.; Def.-Intervenor TRAX's Cross-Mot. for Judgment on the Administrative Record and Opp'n to Pl.'s Mot. for Judgment on the Administrative Record ("TRAX's Cross-Mot."), No. 16-1602C, ECF No. 48. Additionally, TRAX's motion for discovery, TRAX's Mot. for Limited Disc. ("TRAX's Mot. for Disc."), No. 17-88C, ECF No. 27, and the government's motion to dismiss TRAX's complaint for lack of jurisdiction pursuant to RCFC 12(b)(1), Def.'s Mot. to Dismiss and Resp. to Pl.'s Mot. for Disc. ("Def.'s Mot. to Dismiss"), No. 17-88C, ECF No. 34, have been briefed and were addressed at a hearing on February 24, 2017.

---

[13]The Army Mission and Installation Contracting Command is managing the Yuma procurement at issue. TRAX Compl. ¶ 1.

[14]The administrative record in *TRAX* contains every tab and page that is included in the corrected administrative record in *Jacobs*, which was filed on December 19, 2016 and amended on January 3, 2017, plus an additional eighteen tabs related to the procurement. *See supra*, at 3 n.3.

# JURISDICTION

## A.  *Subject-Matter Jurisdiction*

As amended, the Tucker Act provides this court with jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1), added by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (1996); *see also Systems Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012).  The court accordingly has jurisdiction over three types of bid protests: (1) a pre-award protest, (2) a post-award protest, and (3) "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1); *see also OTI Am., Inc. v. United States*, 68 Fed. Cl. 108, 113 (2005) (describing and ruling on the parameters of 28 U.S.C. § 1491(b)).

A challenge to a procuring agency's corrective action can be characterized either as a pre-award protest, *see, e.g., Ceres Gulf, Inc. v. United States*, 94 Fed. Cl. 303, 315-16 (2010) (discussing cases related to corrective action protests and concluding that plaintiff's challenge to the Army's corrective action "amount[ed] to an objection to the Army's pre-award conduct") (citations omitted), or as a claim of an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement," *e.g., Systems Application & Techs.*, 691 F.3d at 1381 (noting that "section 1491(b)(1) provides a broad grant of jurisdiction because '[p]rocurement includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout'") (quoting *Resource Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1244 (Fed. Cir. 2010) (in turn quoting what is now 41 U.S.C. § 111)).  By whichever of those jurisdictional pathways, the court's bid protest jurisdiction includes the review of a procuring agency's decision to take corrective action.  *See, e.g., Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007) (finding that the court's "inquiry into the reasonableness of the [g]overnment's first proposed corrective action, and the court's subsequent determination that the proposed corrective action was not reasonable, were proper"); *Innovative Test Asset Sols. LLC v. United States*, 125 Fed. Cl. 201, 215 (2016) (finding that the court had jurisdiction to review the reasonableness of the procuring agency's corrective action) (citations omitted); *Centech Grp., Inc. v. United States*, 79 Fed. Cl. 562, 574 (2007) ("The Court of Federal Claims possesses jurisdiction to determine if a corrective action taken by an agency in response to a bid protest was reasonable under the circumstances.") (citing *Chapman*, 490 F.3d at 938), *aff'd*, 554 F.3d 1029 (Fed. Cir. 2009).  The court has jurisdiction over corrective action protests "even when such action is not fully implemented."  *Systems Application & Techs.*, 691 F.3d at 1381 (relying for jurisdiction on the so-called "third prong" of Section 1491(b), quoted *supra*).  Additionally, whether the protester raising the challenge was the former contract awardee is not "material to the question of jurisdiction."  *Id.*

Here, Jacobs challenges the Army's decision to take corrective action and the scope of that corrective action, alleging that both were arbitrary and capricious.  *See* Jacobs' Mot. at 15-26.  These claims directly address the Army's most recent corrective action announcement from November 2016, *see* AR 113-8929; AR 114-8933, and thus fall within the court's jurisdiction. The government does not dispute the court's jurisdiction over Jacobs' claims.  *See generally*

Def.'s Cross-Mot. The government does, however, contend that the court lacks jurisdiction over TRAX's claim because TRAX is "not objecting to a solicitation, a proposed award, an award of a contract, or an alleged violation of a statute or regulation." Def.'s Mot. to Dismiss at 4-5. In making this argument, the government incorrectly interprets TRAX's complaint as challenging either the Army's previous third award to Jacobs or the Army's future fourth award for the Yuma contract. *See id.* That is not what TRAX is arguing. Rather than protesting a past or future award, TRAX specifically challenges the "the nature and scope of the Army's corrective action." TRAX's Opp'n to Def.'s Mot. to Dismiss the TRAX Compl. and Reply in Support of TRAX's Mot. for Limited Disc. ("TRAX's Opp'n and Reply") at 7, No. 17-88C, ECF No. 36. Because the Army's procurement officials are allegedly biased against TRAX or in favor of Jacobs, TRAX alleges that the Army's most recent corrective action is not sufficiently broad and requests that the court take further steps to ensure a fair competition. *See id.*; TRAX Compl. ¶ 6. Thus, while Jacobs argues that the Army's corrective action announcement was too broad and TRAX asserts that it was not broad enough, both Jacobs and TRAX bring claims directed to that corrective action. The court therefore has jurisdiction over TRAX's claim as well.

The court emphasizes that the third prong of this court's bid protest jurisdiction provides jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." *See* 28 U.S.C. § 1491(b)(1). The Federal Circuit has stated that this provision is "very sweeping in scope," explaining that "[a]s long as a statute [or regulation] has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction." *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999). Here, TRAX alleges that the Army's conduct demonstrates bias and is in violation of Federal Acquisition Regulations, FAR §§ 3.101-1 and 1.602-2(b). *See* TRAX's Opp'n and Reply at 8-9; *see also* FAR § 3.101-1 ("Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none."); FAR § 1.602-2(b) (requiring contracting officers to "[e]nsure that contractors receive impartial, fair, and equitable treatment"). According to TRAX, these regulations are connected to the procurement at issue because the Army's alleged bias has existed throughout the award process for the Yuma contract and has rendered the scope of the Army's present corrective action unreasonably narrow. *See* TRAX's Opp'n and Reply at 7-9. TRAX has thus sufficiently alleged that the Army violated applicable regulations in connection with the Yuma procurement.

### B. Standing

To have standing in a bid protest, the party bringing suit must be an "interested party." *See* 28 U.S.C. § 1491(b)(1); *Systems Application & Techs.*, 691 F.3d at 1382. A protester will be an interested party if it can show that "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008) (citing *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006)). To prove direct economic interest in a pre-award protest, the protester must demonstrate "a non-trivial competitive injury which can be addressed by judicial relief." *Systems Application & Techs.*, 691 F.3d at 1382 (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009)).

The government does not dispute Jacobs' standing, *see generally* Def.'s Cross-Mot., although TRAX does, *see* TRAX's Cross-Mot. at 19. Here, both Jacobs and TRAX were

offerors in the government's most recent procurement for the Yuma contract.  AR 104-8708.  As the former awardee of the contract, Jacobs has a direct economic interest in the Army's decision to take corrective action and make a new source selection decision.  Jacobs has suffered a "non-trivial competitive injury" because it will have to compete for, and await, a new award decision from the Army after reevaluation of proposals, which may or may not result in an award to Jacobs.  *See Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 149 (2010) (finding that "it is difficult to imagine a party that is more economically interested than [plaintiff] who, having been selected and awarded the contract, would have to wait to receive the [g]overnment's new decision following the resolicitation of proposals").[15]  Although the court has typically found standing in the context of a corrective action calling for a resolicitation of proposals, *see, e.g.*, *id.*; *Delaney Constr. Corp. v. United States*, 56 Fed. Cl. 470, 474 (2003), the reasoning behind such decisions applies to the reevaluation here as well because the Army will be considering Jacobs' and TRAX's proposals in a new light, due to the identified problems related to the oral presentation slides and the staffing baseline.[16]

Insofar as standing is concerned, TRAX's position has some parallels to that of Jacobs.  TRAX was next in line to receive the contract and received [***] for the non-cost factors.  *See* AR 103-8700.  TRAX argues that Jacobs' lower cost proposal, as well as Jacobs' third award, can be attributed to Jacobs' staffing baseline, which the Army allegedly should not have allowed.  *See* TRAX Mot. for Disc. at 10 & n.7.  TRAX has thus sufficiently alleged a "non-trivial competitive injury" and it has a direct economic interest in the Army's corrective action.  *See Delaney Constr.*, 56 Fed. Cl. at 474 ("With respect to the proposed corrective action, plaintiff is

---

[15]In arguing that Jacobs lacks standing, TRAX asserts that Jacobs' reliance on *Sheridan* is inappropriate insofar as Jacobs argues that it "is harmed by having to recompete for the award after its price has been revealed."  TRAX's Cross-Mot. at 19-20.  TRAX notes that the corrective action in *Sheridan* involved a resolicitation, 95 Fed. Cl. at 154, whereas the corrective action here only contemplates a reevaluation, AR 113-8929.  TRAX quotes a specific passage from *Sheridan*, which states that under the circumstances of that case, "a reevaluation of the proposals may be warranted, but a resolicitation of the proposals compromises the integrity of the procurement system, especially where the winning price has been disclosed to the public."  TRAX's Cross-Mot. at 20 n.15 (quoting *Sheridan*, 95 Fed. Cl. at 154).  TRAX's argument passes over standing and essentially addresses the merits of Jacobs' claims.  *Sheridan* is relevant to standing not for its discussion of price disclosure, but rather for the holding that a former contract awardee suffers a non-trivial competitive injury when it is subjected to a reevaluation and forced to compete for a contract a second time, or in this case a fourth time.  Notably, the court in *Sheridan* did not address reevaluation in determining that the protester had standing; the court distinguished reevaluation and resolicitation in discussing the merits of whether the corrective action was unlawful, not in the court's standing analysis.  *See Sheridan*, 95 Fed. Cl. at 147-49, 151-54.

[16]TRAX argues that "if, as Jacobs claims, corrective action tied to the identified error [regarding the revised oral presentation slides] would not ultimately impact Jacobs' evaluation standing in any material way, then admittedly Jacobs suffers no competitive harm from the corrective action."  TRAX's Cross-Mot. at 19.  TRAX's argument is unpersuasive.  Jacobs claims that the Army's decision to take corrective action would "arbitrarily require [Jacobs] to win the same award [for a fourth time]."  *See Systems Application & Techs.*, 691 F.3d at 1382 (citation omitted).  Such a posture connotes a non-trivial competitive injury.  *See id.* at 1382-83.

a prospective offeror whose direct economic interest would be affected by the new award of the contract which would occur on the basis of the corrective action at issue.") (citing *IMS Servs., Inc. v. United States*, 32 Fed. Cl. 388 (1994)).  In sum, both Jacobs and TRAX have standing to pursue their protests.

## C.  Ripeness

The government next argues that TRAX's claim is not ripe for review.  *See* Def.'s Mot. to Dismiss at 6-10.  The purpose of the ripeness doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  An unripe claim is dismissed without prejudice.  *Pernix Grp., Inc. v. United States*, 121 Fed. Cl. 592, 599 (2015) (citing *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1350 (Fed. Cir. 2015)).  The court determines whether an action is ripe by evaluating (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1294-95 (Fed. Cir. 2008) (citing *Abbott Labs.*, 387 U.S. at 149).

First, with respect to fitness for judicial review, the court must determine "whether the challenged conduct constitutes a final agency action." *Systems Application & Techs.*, 691 F.3d at 1384 (citations omitted).  To be considered final, the agency action must: (1) "mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  Second, with respect to hardship, the court must consider whether withholding court consideration would have an "immediate and substantial impact" on the plaintiff.  *Caraco Pharm. Labs.*, 527 F.3d at 1295 (quoting *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967)).  The mere possibility of harm is insufficient.  *See Pernix Grp.*, 121 Fed. Cl. at 599 ("Abstract, avoidable or speculative harm is not enough to satisfy the hardship prong.") (citing *Texas v. United States*, 523 U.S. 296, 301-02 (1998)).  Nonetheless, the hardship prong requires a lesser showing compared to the showing required for obtaining injunctive relief, where a plaintiff must demonstrate irreparable harm.  *See Systems Application & Techs.*, 691 F.3d at 1385.

Regarding fitness for judicial review, the government asserts that TRAX's claim is not ripe because the Army's "decision to take corrective action is not a final decision." Def.'s Mot. to Dismiss at 8.  The government states that "[u]ntil the agency takes final action, *e.g.*, makes an award under the reprocurement or cancels the reprocurement, the agency has not consummated its decision-making process." *Id.*  Before that occurs, the Army could cancel the procurement or change the corrective action.  *Id.*  Further, according to the government, TRAX's rights and obligations will only be determined by the Army's final award decision.  *Id.*  The government's argument is not consistent with Federal Circuit precedent.  In *Systems Application & Techs.*, the government presented an argument to the Federal Circuit that is similar to its argument before this court:

> According to the Army, its statements . . . that it intended to engage in corrective action were not binding and nothing prohibited the Army from abandoning its

proposed course of action and allowing [plaintiff's] award to stand. . . .  In its view, the decision to take corrective action will not be fully consummated unless and until the Army re-awards the contract to an offeror other than [plaintiff, the former contract awardee challenging the corrective action].

691 F.3d at 1384 (internal citations and quotation marks omitted).  The court of appeals rejected the government's argument because, among other reasons, "[t]he Army memorialized its decision to take corrective action in a letter to the GAO and the parties, stating: the Army has determined that it is in its best interest to take corrective action."  *Id.* (internal citations and quotation marks omitted).  The Army's corrective action announcement also resulted in "irretrievable legal consequences," including GAO's dismissal of an award protest regarding the procurement.  *Id.*  The Army's decision to take corrective action was thus considered final.  *Id.* at 1385.

Here, similarly, the Army announced its decision to take corrective action, stating that it would be reevaluating the offerors' final revised proposals and making a new source selection decision.  AR 113-8929.  The Army accompanied that decision with a memorandum explaining the basis for the action.  AR Tab 114.  Such a decision was final and had direct legal consequences, including the rescission of Jacobs' award and GAO's dismissal of TRAX's protest.  *See* AR Tab 115.  The fact that the Army could change course in the future by, for example, amending or canceling the solicitation, does not render TRAX's claim unripe.  *See Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 179, 182 (2011) ("The mere fact that an agency may always amend the [RFP] cannot render pre-award bid protests unripe.").  TRAX is not protesting the fourth award that the Army has not yet provided, but is instead challenging the scope of the Army's present corrective action.  *See Sheridan*, 95 Fed. Cl. at 150 (holding that plaintiff's corrective action protest was fit for judicial review because plaintiff was "not challenging the results of the corrective action," but was rather "challenging the implementation of the corrective action itself").  The Army's decision to take corrective action and the scope of that corrective action are final decisions that are fit for judicial review.

Additionally, TRAX has demonstrated sufficient hardship.  The Federal Circuit has held "that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007); *see also CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 713 (2011) ("[B]y holding its fire until after the contract was awarded to its competitor, [plaintiff] waived its opportunity to raise issues concerning [the awardee's] prior performance of the enjoined contract."), *aff'd*, 475 Fed. Appx. 341 (Fed. Cir. 2012).  Thus, if the court withholds review of TRAX's bias claim regarding the Army's corrective action, TRAX's claim will be rendered untimely after the fourth award is made and there would be no judicial review of TRAX's present claim.  While the government correctly notes that TRAX could ultimately receive the fourth award, Def.'s Mot. to Dismiss at 8-9, this court has previously found that the potential waiver of a protester's claim presents sufficient hardship to warrant judicial review, *see Centech Grp.*, 78 Fed. Cl. at 506 (finding hardship where plaintiff challenged agency corrective action because "refusing to address [p]laintiff's pre[-]award protest . . . would be tantamount to denying judicial review"); *Sheridan Corp.*, 95 Fed. Cl. at 150 (holding that plaintiff's corrective action protest claim was ripe because, among other reasons, plaintiff could not later raise such a claim).

The government nonetheless responds that TRAX would in actuality have an opportunity to protest the fourth award decision if it wishes to do so, *see* Def.'s Mot. to Dismiss at 9, specifically relying on *Square One Armoring Serv., Inc. v. United States*, 123 Fed. Cl. 309 (2015).  There, the court stated:

> If at the conclusion of the re-procurement process, the record establishes that [the government] did not properly carry out the corrective action, [plaintiff] will have the opportunity to challenge the new award decision. . . .  Thus, plaintiff's anticipated claims regarding the implementation or execution of [the government's] proposed corrective action are not yet ripe for review.

*Id.* at 329-30 (internal citations and quotations marks omitted).  The government's reliance on *Square One*, however, is misplaced.  The claims in *Square One* were directed to the execution of, rather than the scope, of the corrective action.  *See id.* at 329 ("[A]ny allegation that [government] officials will not act in good faith *in executing the corrective action*, which includes re-procuring the requirement, raises purely hypothetical arguments. . . .") (emphasis added) (internal quotation marks and citations omitted); *id.* at 330 ("'[C]hallenges to *the outcome of th[e] [corrective] action* at this time are . . . not fit for judicial review.'") (emphasis added) (quoting *Eskridge Research Corp. v. United States*, 92 Fed. Cl. 88, 95 (2010)).  In contrast, TRAX is not challenging the Army's execution of the corrective action or the fourth Yuma contract not yet awarded.  Instead, TRAX is challenging the scope of the Army's corrective action itself, arguing that it is not broad enough to address the Army's alleged bias.  *See* TRAX's Opp'n and Reply at 7; TRAX Compl. ¶ 6.  The announced scope of the corrective action is a final decision by the Army that is fit for judicial review, and withholding such review would otherwise prevent TRAX from raising the claim after the fourth award.  TRAX's claim is therefore ripe for review.

Jacobs' claims, which are directed to the Army's decision to take corrective action and the scope of the present corrective action, *see* Jacobs' Mot. at 15-26, are ripe for the same reasons.  TRAX responds in its cross-motion for judgment on the administrative record that Jacobs claims are not ripe for judicial review "because the Army has not finalized a decision about the precise scope of the corrective action that it intends to take."  TRAX's Cross-Mot. at 20-21.  TRAX's contention is nearly identical to the argument presented by the government in its motion to dismiss TRAX's complaint, which this court has rejected, as discussed *supra*.  Jacobs' challenges to both the decision to take corrective action and the current scope of that action are thus ripe for review.

One aspect of Jacobs' challenge and TRAX's response deserves further attention, however.  In asserting that the corrective action is overly broad, Jacobs also relies on the possibility that the Army could reopen discussions and resolicit final proposals.  *See* Jacobs' Mot. at 25-26; AR 114-8933 ("After the Army reevaluates proposals in accordance with the [s]olicitation, as amended, it will determine whether it will exercise its discretion to re-open discussions.").  This argument is not ripe.  The corrective action only contemplates reevaluation at this time.  AR 114-8933.  The Army's later execution of the correction action, resulting in a possible resolicitation, is a future event that is not ripe for review.  *See Square One*, 123 Fed. Cl. at 329-30.  The court has jurisdiction over both of Jacobs' claims, but only to the extent that such claims challenge the Army's currently announced corrective action.

### D. Mootness

Finally, the government contends that TRAX's "challenge to the award of the contract is moot because the agency is cancelling the award and will reevaluate proposals." Def.'s Mot. to Dismiss at 6.  This argument by the government wrongly assumes that TRAX is challenging the Army's previous contract award, rather than the corrective action, and accordingly relies on precedents where corrective action mooted a protester's challenge to the award itself.  *See SOS Int'l LLC v. United States*, 127 Fed. Cl. 576, 589 (2016) ("[A]ny challenge to the original evaluation of proposals for the [contract] has been mooted by the Army's decision to take corrective action.") (citation omitted); *Dellew Corp. v. United States*, 124 Fed. Cl. 429, 430-32 (2015) (finding plaintiff's challenge to a contract award moot due to the Army's subsequent corrective action, but nonetheless addressing defendant-intervenor's separate challenge to the scope of the corrective action on the merits); *Sigmatech, Inc. v. United States*, 122 Fed. Cl. 674, 675-76 (2015) (holding that plaintiff's challenge to the contract award was rendered moot by the government's subsequent corrective action).  The cases cited by the government are not relevant to TRAX's dispute because, as discussed *supra*, TRAX is specifically challenging the scope of the corrective action by alleging that such action is not broad enough to resolve the alleged bias on the part of the procurement officials.  *See* TRAX's Opp'n and Reply at 7; TRAX Compl. ¶ 6.  As the court previously explained:

> Intervenor argues that [plaintiff] does not assert a justiciable claim because typically an agency's offer to institute corrective action renders a protest moot.  While this observation may be true in some circumstances, it does not apply here.  In the instant case, the corrective action is itself the agency decision which is being challenged.  While the issuance of [an amendment to the RFP] may have mooted the GAO protest, it does not moot the instant action.

*Centech Grp.*, 78 Fed. Cl. at 504.  Although TRAX addresses the Army's evaluation process over the course of the three previous Yuma contract awards, *see, e.g.*, TRAX Compl. ¶¶ 10-63, TRAX does so in an attempt to show that the procurement officials' pattern of past conduct creates a present need for a broader corrective action.  TRAX's bias claim is directed to the Army's corrective action, and is therefore not moot.[17]

### STANDARDS FOR DECISION

#### A. The Army's Corrective Action

The court's review of an agency's procurement decision is governed by the Administrative Procedure Act ("APA"), specifically 5 U.S.C. § 706.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").  Under this section of the APA, the court may set aside an agency decision if the court finds the decision to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The arbitrary and

---

[17] Jacobs' corrective action protest has not been challenged on mootness grounds.

capricious standard is "highly deferential." *See Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). Accordingly, the court may not "substitute its judgment for that of the agency." *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977)), *recons. denied*, 60 Fed. Cl. 251 (2004).

Notwithstanding this deferential standard, the court may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted). The "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency's decision lacks a rational basis, and is therefore arbitrary and capricious, when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *State Farm*, 463 U.S. at 43).

In the context of corrective action, "[a] contracting agency has broad discretion whether to pursue corrective action during the course of a procurement." *Wildflower Int'l, Ltd. v. United States*, 105 Fed. Cl. 362, 385-86 (2012) (quoting *Systems Application & Techs., Inc., v. United States*, 100 Fed. Cl. 687, 716 (2011), *aff'd*, 691 F.3d 1374 (Fed. Cir. 2012); *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 186, 190 (2011)). The court will uphold an agency's decision to take corrective action "if it is rational, reasonable, and coherent and reflects due consideration of all relevant factors." *Systems Application & Techs.*, 100 Fed. Cl. at 716. If the decision was reasonable, the court must also assess "whether the corrective action itself was 'reasonable under the circumstances.'" *Wildflower Int'l*, 105 Fed. Cl. at 389 (quoting *Sheridan*, 95 Fed. Cl. at 151 (in turn quoting *DGS Contract Serv., Inc. v. United States*, 43 Fed. Cl. 227, 238 (1999))).

Reviewing courts have not been fully consistent in applying this reasonableness standard. *Compare Sheridan*, 95 Fed. Cl. at 151 ("To be reasonable, the agency's corrective action must be rationally related to the defect to be corrected."), *with Sierra Nevada Corp. v. United States*, 107 Fed. Cl. 735, 751 (2012) (applying a "reasonable in-the-circumstances test" and declining to use the "targeted-action test" from *Sheridan* because the corrective action case before the court was "more nuanced").[18] Here, however, the court need not choose between these differing

---

[18]The court in *Sierra Nevada* explained that the *Sheridan* test was too restrictive for the dispute before it:

> For example, in this case, unlike *Sheridan,* discussions had taken place and proposal revisions had been submitted, so that resolicitation as opposed to reevaluation would be viewed as reasonable in the circumstances. As another example, Amendment 0008 amended portions of the [s]olicitation that were not related to the alleged defects, although the Air Force was attempting by those amendments to avoid evaluation problems of the same nature that might reoccur

approaches.[19]   For purposes of this bid protest dispute, the critical inquiry involves an examination of the reasoning underlying the agency's corrective action.  To be reasonable, the agency must have "examined the relevant data and articulated a coherent and reasonable explanation for [its] decision."  *WHR Grp.*, 115 Fed. Cl. at 396 (citing *State Farm*, 463 U.S. at 43; *Impresa Construzioni*, 238 F.3d at 1333).  The agency's decision must also be supported by the record.  *Sierra Nevada*, 107 Fed. Cl. at 750; *Sheridan*, 95 Fed. Cl. at 151 (citation omitted).

### B.  TRAX's Discovery Request

The court's review of a protest brought against a procuring agency is generally "based on the record the agency presents to the reviewing court."  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379-80 (Fed. Cir. 2009) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985)).  "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to convert the arbitrary and capricious standard into effectively de novo review."  *Id.* at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)).  Nonetheless, to ensure effective review, the record before the court must provide "the information upon which the agency relied when it made its decision as well as any documentation revealing the agency's decision-making process."  *Pitney Bowes Gov't Sols., Inc. v. United States*, 93 Fed. Cl. 327, 332 (2010) (citing *Citizens to Preserve Overton Park*, 401 U.S. at 420).  Accordingly, the administrative record should be supplemented only when "the omission of extra-record evidence precludes effective judicial review."  *Axiom Res. Mgmt.*, 564 F.3d at 1380 (quoting *Murakami*, 46 Fed. Cl. at 735).

In the context of a bid protest, the court may permit discovery when "there has been a strong showing of bad faith or improper behavior," such that "the administrative record cannot be trusted" absent discovery.  *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 82 Fed. Cl. 757, 766 (2008) (internal quotation marks and citations omitted).  "[A]llegations of bad faith must be based on hard facts," especially when the procuring agency has given a reasonable explanation for its decision.  *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 130 (2010) (quoting *International Res. Recovery, Inc. v. United States*, 61 Fed. Cl. 38, 43 (2004)) (internal quotation marks omitted).  The allegations cannot "rest merely on counsel's argument, suspicion, or conjecture."  *Pitney Bowes*, 93 Fed. Cl. at 332 (citing *Madison Servs.*, 92 Fed. Cl. at 130-31).  Because agency decisions are entitled to a presumption of regularity, discovery will not be permitted "unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious."  *Alabama Aircraft Indus.*, 82 Fed. Cl. at 773 (quoting *Impresa Construzioni*, 238 F.3d at 1338) (internal quotation marks omitted).  Ultimately, to supplement the record, the protester must "1) make a threshold showing of either a motivation for the [g]overnment employee to have acted in bad faith or of conduct that is hard to

---

when the new proposals were evaluated.  The reasonable in-the-circumstances test should apply; the targeted-action test would be too restrictive.

*Sierra Nevada*, 107 Fed. Cl. at 751.

[19] *See WHR Grp., Inc. v. United States*, 115 Fed. Cl. 386, 395-97 (2014) (discussing cases examining corrective action protests, including *Sheridan* and *Sierra Nevada*, and concluding that "there can be no universal test as to what constitutes appropriate corrective action.").

explain absent bad faith, and 2) persuade the [c]ourt that discovery could lead to evidence that would provide the level of proof sufficient to overcome the presumption of regularity and good faith." *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, 355 (2010) (citing *Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004)), *amended in part on recons.*, 98 Fed. Cl. 45 (2011).

### C.  Failure to State a Claim Upon Which Relief Can be Granted

To state a claim upon which relief can granted under RCFC 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The facts alleged must sufficiently "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Kam-Almaz v. United States*, 682 F.3d 1364, 1367-68 (Fed. Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).  The court must accept all factual allegations in the complaint as true and draw "all reasonable inferences in favor of the non-movant," *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (internal citations omitted), but it need not accept legal conclusions, *Rack Room Shoes v. United States*, 718 F.3d 1370, 1376 (Fed. Cir. 2013) (citing *Iqbal*, 556 U.S. at 678).

# ANALYSIS

## I.  JACOBS' CLAIMS

Jacobs specifically focuses on the Army's consideration of Jacobs' revised oral presentation slides in challenging the Army's decision to take corrective action and the scope of that corrective action.  *See* Jacobs' Mot. at 15-23, 24-26.

### A.  The Decision to Take Corrective Action

In deciding to take corrective action, the Army found that an error occurred when it considered Jacobs' revised oral presentation slides during the third evaluation process.  Under the terms of the solicitation, "[c]ontent on [oral presentation] slides submitted, but not briefed in the [oral] presentation, [would] not be considered in the evaluation." AR 23-2622.  The Army restated this requirement before the submission of proposals for the third award, noting that if an offeror revised its oral presentation slides, "an oral presentation briefing [would be] required to have the slides considered." AR 77b-6272.  If necessary, that oral presentation was to take place on July 21, 2016.  AR 77c-6275.  Jacobs submitted its proposal on July 20, 2016 for the third award without making a new oral presentation during the third evaluation process, *see* AR 78-6279; AR 114-8933, but then changed many of its oral presentation slides in its revised proposal submitted on September 23, 2016, *see* AR 118-9939 to -40.  The Army cited Jacobs' submission of revised oral presentation slides without a new presentation as one of the Army's bases for corrective action, explaining that "the Army relied upon these un-briefed slide revisions" when evaluating Jacobs' mission capability approach, which was in violation of the solicitation.  AR 114-8933.

Jacobs acknowledges that it erred by submitting revised slides, which were considered by the Army, but not then making a new oral presentation.  Hr'g Tr. 14:14-19 (Feb. 9, 2017), No.

16-1602C.[20]  Jacobs also accepts the Army's assessment that the revisions were "numerous." *See* Hr'g Tr. 14:20-21; AR 114-8933.[21]  Nonetheless, Jacobs argues that the Army's decision to take corrective action was unwarranted because the Army's consideration of the revised slides did not affect the evaluation of Jacobs' proposal or the outcome of the third award process, and therefore the error was "not prejudicial."  Jacobs' Mot. at 15-23.  Jacobs supports its claim by asserting that the changes to the slides were administrative and unrelated to its mission capability approach, nearly all of the changes appeared elsewhere in its proposal, and it received identical ratings for mission capability before and after submission of the revised slides.  *See id.* at 15-16, 19-20; Jacobs' Opp'n to Cross-Mots. at 9.

Jacobs points to the general precept that to prevail in a bid protest, "[a] protester must show not simply a significant error in the procurement process, but also that the error was prejudicial."  *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (citation omitted); *see also* Jacobs' Mot. at 21.  Under this maxim, a bid protester must show that an alleged error by the procuring agency prejudiced the protester; the rule does not, on the other hand, stand for the proposition that an agency can rationally act in a procurement to institute corrective action only when there is an error coupled with a showing of prejudice to an offeror.  *See MSC Indus. Direct Co. v. United States*, 126 Fed. Cl. 525, 533 n.5 (2016) ("The considerations brought to bear when it is the agency's own procurement needs that prompt corrective action are fundamentally different from a situation in which a competitor alleges that corrective action is warranted by potential prejudice to it.").  Jacobs seeks to place a burden of demonstrating prejudice on the agency, asserting that "corrective action must be based on a prejudicial error."  Jacobs' Mot. at 21.  However, Jacobs' attempt to impose a prejudice requirement on the Army's decision to take corrective action is unsupported by any precedent in the Federal Circuit or this court.  Instead, it is inconsistent with prior case law addressing corrective action.  *See Wildflower Int'l*, 105 Fed. Cl. at 389 n.18 (addressing a corrective action protest and noting that "whether [an offeror] was specifically prejudiced by the ambiguity [in the solicitation] is not dispositive"); *Jacobs*, 100 Fed. Cl. at 197 ("[E]ven if GAO denied the protest (*e.g.*, for lack of prejudice), the agency could still decide to take corrective action.").

Jacobs supports its proffered "prejudicial error" rule by relying on a GAO decision, *Security Consultants Grp., Inc.*, B-293344.2, 2004 WL 691223 (Comp. Gen. Mar. 19, 2004), *recons. granted in part and denied in part*, B-293344.6, 2004 WL 2480957 (Comp. Gen. Nov. 4, 2004).  In that decision, GAO stated:

> Where the corrective action taken by an agency is otherwise unobjectionable, a
> request for revised price proposals is not improper merely because the awardee's
> price has been exposed. . . .  We have recognized a limited exception to that rule

---

[20]The date will be omitted from subsequent citations to the transcript of the hearing held on February 9, 2017 in *Jacobs*, No. 16-1602C.

[21]Prior to the hearing, Jacobs stated in its brief that it "was not required to submit revised oral presentation slides."  Jacobs' Opp'n to Cross-Mots. at 3.  Although Jacobs is correct, this fact alone is not helpful to Jacobs' claims.  Because Jacobs chose to submit changes to its slides, such changes could only be considered by the Army if Jacobs made a new oral presentation.  *See* AR 77b-6272.  The Army's evaluation of Jacobs' revised slides without a new presentation was therefore not in compliance with the solicitation.

> where the record establishes that there was no impropriety in the original
> evaluation and award, or that an actual impropriety did not result in any prejudice
> to offerors[.  In that circumstance,] reopening the competition after prices have
> been disclosed does not provide any benefit to the procurement system that would
> justify compromising the offerors' competitive positions.

*Security Consultants Grp.*, 2004 WL 691223, at *2 (citations omitted).  Jacobs' reliance on *Security Consultants* is unavailing.  The basis for the decision in *Security Consultants* is distinguishable from the protest before this court.  In *Security Consultants*, GAO determined that if an error in the solicitation did not prejudice the offerors and prices had been disclosed, the agency's reopening of the competition would not be warranted.  2004 WL 691223, at *2.  Here, however, the Army is currently only reevaluating proposals and has not reopened discussions.  *See* AR 114-8933.  Accordingly, GAO's concern that price disclosure would "compromis[e] the offerors' competitive positions," 2004 WL 691223, at *2, is not applicable in this dispute.[22]

Even if the Army had reopened the competition, the commentary in *Security Consultants* only applies when prices had been disclosed and there was no impropriety in the evaluation and award process, or when the impropriety occurred but did not prejudice the offerors.  2004 WL 691223, at *2.  Here, an error occurred when the Army considered Jacobs' revised slides.  AR 114-8933.  And to the extent that prejudice is relevant, the court rejects Jacobs' assertion that no prejudice occurred because it submitted Jacobs' revised, but un-briefed, slides.  As the Army explained, Jacobs' revisions were "numerous and substantive," and "Jacobs' failure to provide a new oral presentation deprived the Army from asking questions during the clarification session."  AR 114-8933.  Jacobs' revised slides included changes to its organization chart, contracting team, key personnel, and cost reduction metric, among other changes.  *See* AR 118-9939 to -40.  These changes specifically related to the mission capability requirements set forth in the RFP, *see, e.g.*, AR 3-189 (requiring offerors to address "the expertise of each proposed team member and/or subcontractor" under the technical risk sub-factor of mission capability), and thus substantively affected Jacobs' mission capability approach.[23]  Jacobs' supporting contention that no prejudice occurred because it received the highest possible ratings for mission capability both before, AR 93-8548, and after it submitted revised slides, AR 104-8708; *see* Jacobs' Mot. at 19-20, is based on unjustified assumptions and inferences.  The extent to which the revised slides benefitted Jacobs' evaluation is not evident from the administrative record.  What is apparent from the record is that the Army had questions about the topics Jacobs covered in its revised

---

[22]Jacobs' price has been disclosed to TRAX, *see* AR 110-8812, but this fact alone does not render the Army's corrective action unlawful, *see Wildflower Int'l*, 105 Fed. Cl. at 391 ("[B]ecause [the agency's] disclosure of [the protester's] price information was lawful and the offerors knew or should have known that the price of the winning bid would be revealed, and because the corrective action was reasonably calculated to cure the defect in the solicitation, it was proper for [the agency] to implement the corrective action despite the fact that other offerors knew [the protester's] winning price.") (citation omitted).

[23]Jacobs points to a memorandum prepared by a Contract Specialist in October 2016, which characterized the changes to the slides as "administrative."  *See* Jacobs' Mot. at 16 (citing AR 106-8754).  This memorandum was in effect superseded by the Contracting Officer's subsequent determination.

proposal submitted after the time for oral presentations had passed.  On August 30, 2016 and September 6, 2016, the Contracting Officer issued Evaluation Notices ("ENs") to Jacobs asking it to identify who would perform certain work due to the deletion of a subcontractor from its previously proposed team.  AR 84-8447 to -49; AR 88-8477.  Jacobs responded to the ENs on September 8, 2016, stating that it was updating its "Staffing Plan, Past Performance proposal, Small Business Participation Plan, and Cost Volume."  AR 116-8937.  Several weeks thereafter, on September 23, 2016, Jacobs submitted its final proposal revision and its revised slides.  *See* AR Tab 118.  On the same day, TRAX submitted its final proposal revisions.  AR Tab 119.  Based on this timing, TRAX claims that Jacobs received an unfair advantage.  *See* TRAX's Reply in Support of its Cross-Mot. for Judgment on the Administrative Record ("TRAX's Reply in Support of Cross-Mot.") at 15, No. 16-1602C, ECF No. 54, and the government makes a similar, albeit more cryptic, contention, *see* Def.'s Reply to Pl.'s Resp. and Reply to Def.'s Cross[-]Mot. for Judgment on the Administrative Record ("Def.'s Reply in Support of Cross-Mot.") at 2, No. 16-1602C, ECF No. 53.  In these circumstances, it is apparent that the Army's procurement officials had at least some questions about Jacobs' final revised proposal.  These questions may have been answered by Jacobs' responses to the ENs and by revisions to Jacobs' slides, but an oral interchange and interlocution may have served a clarifying purpose, as the solicitation contemplated.  The court has no basis in the record to discount that possibility or the Army's decision to take corrective action on that ground.  Thus, for the reasons stated, the Army's decision to take corrective action was reasonable.[24]

### B.  The Designated Scope of the Corrective Action

The scope of the corrective action designated by the Army focuses on a reevaluation of Jacobs' and TRAX's proposals and a new source selection decision.  AR 114-8933.  Jacobs claims that this corrective action is flawed because it is "not targeted to any procurement defect" identified by the Army in its memorandum explaining the decision to take corrective action, Jacobs' Mot. at 24-25, but that contention ignores the Army's explanation that it had improperly relied on Jacobs' revised oral presentation slides, which were submitted but never presented, when evaluating Jacobs' proposal, AR 114-8933.  Contrary to Jacobs' position, a reevaluation specifically addresses this error because a subsequent evaluation in accord with the terms of the solicitation will ensure that Jacobs and TRAX are evaluated based upon oral presentation slides that have been briefed to the Army at an oral presentation.  The corrective action is rationally related to the defect that the Army identified and is thus not overly broad.  Notably, the Army's proposed reevaluation is narrower than an alternative course of action, resolicitation of proposals.  Jacobs' primary concern with the scope of the corrective action appears to be the possibility of the Army pursuing this alternative course and reopening discussions, *see* Jacobs'

---

[24]The Army also identified a problem regarding TRAX's staffing baseline in its corrective action memorandum, AR 114-8933, but the court need not address this issue in resolving Jacobs' claims.

TRAX raises other grounds to justify the Army's corrective action, including issues related to an alleged organizational conflict of interest on Jacobs' part, Jacobs' staffing plan, and the Army's cost-technical trade-off analysis.  *See* TRAX's Cross-Mot. at 30-39.  TRAX's additional proffered bases were not adopted by the Army and thus will not be considered by the court.

Mot. at 25-26; AR 114-8933, but as addressed *supra*, that concern is not ripe for review because the Army has not taken such action.

In sum, the Army identified an error in the procurement after it considered Jacobs' revised oral presentation slides without hearing a new oral presentation, and it sufficiently explained why corrective action was necessary. The Army's corrective action also is reasonably tailored to address that error. Thus, the Army's decision to take corrective action and the scope of that corrective action were reasonable under the circumstances.

## II.  TRAX'S CLAIM

In presenting its motion for discovery, TRAX claims that discovery is warranted "to further develop the record" regarding the Army's alleged bias against TRAX or in favor of Jacobs. TRAX's Mot. for Disc. at 13. TRAX seeks to depose five specific Army personnel "who have been directly involved in the evaluations and award decisions . . . and will likely be involved in continuing evaluations in this procurement." *Id*. at 13-15. TRAX also requests that the Army produce specific documents and materials that, according to TRAX, are related to the staffing baseline for this procurement and the Army's alleged bias. *Id*. at 15-16.

A bid protester seeking discovery must "1) make a threshold showing of either a motivation for the [g]overnment employee to have acted in bad faith or of conduct that is hard to explain absent bad faith, and 2) persuade the [c]ourt that discovery could lead to evidence that would provide the level of proof sufficient to overcome the presumption of regularity and good faith." *L-3 Commc'ns*, 91 Fed. Cl. at 355 (citation omitted); *see supra*, at 21-22. The protester must assert a "reasonable factual predicate" for its allegation of bias or bad faith, a lower burden of proof than that for such an allegation on the merits, which requires clear and convincing evidence. *See L-3 Commc'ns*, 91 Fed. Cl. at 355. Here, TRAX's claim focuses solely on Army conduct that is allegedly "hard to explain absent bad faith." TRAX's Opp'n and Reply at 10.

TRAX argues that it has made a threshold showing of conduct that is hard to explain absent bad faith, stating that the Army has "knowingly and deliberately ignored" problems related to baseline staffing during the three awards in this procurement, "each time to the benefit of Jacobs." TRAX's Mot. for Disc. at 12. Specifically, in the first evaluation, procurement officials reported a "[p]roblem" regarding baseline staffing data and noted that Jacobs had used a lower starting point for its baseline number of total labor hours compared to TRAX, *see* AR Tab 124, but the SSA determined that Jacobs had offered the best value, AR 30-3206. In the second evaluation, procurement officials noted a similar problem where Jacobs had a lower starting point for baseline labor hours compared to TRAX, *see* AR Tab 130, and the SSA again issued a decision in favor of Jacobs, AR 60-5876. Third, after the SSA found for Jacobs in the third evaluation, AR 104-8720, the Army's corrective action explained that *TRAX's proposal* had "deviated from the baseline in the RFP instruction," AR 114-8933. TRAX asserts that the Army had not previously communicated with TRAX regarding this issue or made any cost adjustment during the third evaluation process. TRAX's Opp'n and Reply at 13.[25] TRAX contends that

---

[25]TRAX also disagrees with the Army's baseline staffing issue as identified in the corrective action memorandum, arguing that Jacobs' overtime staffing approach, rather than TRAX's approach, violated the RFP. *See, e.g.*, TRAX's Opp'n and Reply at 17-19. The court need not resolve this dispute, however, as TRAX acknowledges that this issue is "only

these three incidents, all supposedly involving the Army's failure to establish and enforce a common baseline, demonstrate a pattern of improper conduct that justifies discovery. *Id.*

TRAX, however, has failed to make a threshold showing of conduct by the Army that is hard to explain absent bad faith. Although TRAX correctly notes that problems have arisen in the three award evaluations related to baseline staffing, errors in an evaluation process do not alone suffice to demonstrate bad faith or permit discovery. *See Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003) (finding that "the court did not err in refusing discovery on alleged bias" because the protester "merely reiterated its contentions that the Air Force erred in evaluating the proposals"); *Four Points by Sheraton v. United States*, 63 Fed. Cl. 341, 344-45 (2005) (holding that the protester's disagreement with the award evaluation did not indicate a motive for bias or conduct that was difficult to explain absent bias). Similarly, the fact that Jacobs' proposals were evaluated based upon the same staffing starting point but with different adaptations does not show bad faith on the part of Army. *See Beta Analytics*, 61 Fed. Cl. at 226 (holding that the protester failed to make the threshold showing necessary for discovery when it argued that the "scoring of its proposal" by one evaluator had differed from the scoring of the proposal by other evaluators, and also noting that "[i]nnuendo or suspicion is not enough to demonstrate bad faith") (citations omitted).

TRAX acknowledges that it "may have been understandable" for the Army to initially commit an error regarding the staffing baseline, but it argues that the occurrence of baseline-related errors over the course of three evaluations justifies discovery. TRAX's Mot. for Disc. at 12-13; *see also* TRAX's Opp'n and Reply at 13 (claiming the Army has engaged in a "pattern" of misconduct). TRAX broadly alleges that various procurement officials, including the Contracting Officer, Cost/Price Analyst, SSA, and other personnel, have repeatedly failed to enforce a common staffing baseline to the benefit of Jacobs, *see* TRAX Compl. ¶¶ 4-5, but the critical officials for the Yuma contract have changed over the course of this procurement. For example, the SSA was Colonel Timothy A. Starostanko for the first and second awards, AR 30-3217; 60-5899, but was then Patrick B. Hogston for the third award, AR 104-8720. The chair of the Source Selection Evaluation Board also changed from Christopher J. Johnson during the first two awards, AR 29-3116; AR 58-5823, to Jeffrey B. Tatar in the third award, AR 87-8475. Further, the Contracting Officer was R. Colette Carrizales for the first award, AR 29-3116, and Michael K. McDaniel for the second and third awards, AR 39-3389; AR 106-8739, and is now presently Christopher Chapple, AR 114-8934. Given these changes in the responsible officials and the lack of evidence of misconduct, drawing an inference of bad faith is problematic. Rather, the errors appear to simply reflect the difficulties the Army has experienced in attempting to set a template for baseline staffing. Such difficulties stem, at least in part, from the nature of the Yuma testing facility, which has an uneven workflow and staffing needs that are hard to predict. *See, e.g.*, AR 3-97 (stating that the Yuma facility requires an "ever-changing work effort" where the demands "change[] constantly" and contractors must be "flexible and adaptable"); AR 5b-457 (explaining that the Army could not provide "forecasted" information regarding full-time equivalents needed beyond the base period of the contract).

TRAX's reliance on prior case law where discovery was permitted in a bid protest is also unavailing. For example, in *Pitney Bowes*, the protester alleged bias in favor of another offeror

_____

tangentially relevant" to TRAX's claim; TRAX asserts that the "true issue" relates to the Army's failure to enforce a common staffing baseline. *See id.* at 28-29.

due to a personal relationship between a member of the agency's evaluation board and the vice president of that offeror's subcontractor.  93 Fed. Cl. at 330.  The court found that the protester met the threshold showing to warrant discovery after the protester had submitted affidavits regarding improper pre-procurement communications from the contracting officer's technical representative.  *Id.* at 330, 333-34.  Similarly, in *International Resource Recovery*, the court allowed discovery when the protester argued that the contracting officer knowingly failed to disclose the reason for the termination of the protester's previous contract.  61 Fed. Cl. at 40, 43.  Here, in contrast, the procurement officials involved have not engaged in improper pre-procurement communications or intentionally or knowingly failed to disclose any information related to Jacobs' or TRAX's proposals.  The Army has been well aware of the issue related to the staffing baseline, and has attempted to deal with it through amendments to the solicitation and ENs.  For example, the Army acknowledged the baseline problem during the first evaluation process, but also noted that Jacobs proposed [***] than TRAX and would have proposed [***].  AR 124-13127, -13133.  And in the second round of evaluations, the Army made [***] to Jacobs' costs because Jacobs' [***].  *See* AR 59-5871; AR 60-5883 to -84.  The Army's continued struggles with this staffing baseline are thus not an indication of bad faith or bias, but rather reflect the difficult nature of estimating future staffing needs at the Yuma facility, and Jacobs' and TRAX's different approaches to baseline staffing in their proposals.[26]

Under these circumstances, TRAX has not made a threshold showing of conduct that is hard to explain absent bad faith.  TRAX's request for discovery is therefore denied.  Further, because the burden of proof for an allegation of bad faith in a discovery request is lower than the clear and convincing standard applicable to a bad faith allegation on the merits, *see L-3 Commc'ns*, 91 Fed. Cl. at 355, TRAX has also failed to present a viable bias claim on the merits.  Accordingly, TRAX's protest shall be dismissed for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6).

## CONCLUSION

For the reasons stated, Jacobs' motion for judgment on the administrative record is DENIED, and the government's and TRAX's cross-motions for judgment on the administrative record are GRANTED in *Jacobs*, No. 16-1602C.[27]  Accordingly, Jacobs' request for injunctive and declaratory relief is DENIED.  Additionally, in *TRAX*, No. 17-88C, TRAX's motion for discovery is DENIED, and the government's motion to dismiss TRAX's complaint is GRANTED for failure to state a claim upon which relief can be granted.  TRAX's request for

---

[26]TRAX notes that Jacobs received a clarification request from the Army regarding Jacobs' [***] on August 30, 2016, AR 84-8448, whereas TRAX did not receive such a request, TRAX's Opp'n and Reply at 27 n.12.  However, the Army's decision to inquire into Jacobs' staffing proposal does not suggest bias in favor of Jacobs or against TRAX, but rather provides further indication that the Army has had difficulty in evaluating staffing against the baseline.  The Army's clarification request also properly occurred during the third evaluation process, and is thus distinguishable from the improper discussions that were alleged in *International Resource Recovery*, 61 Fed. Cl. at 40, 43.

[27]TRAX's motion to supplement the administrative record in *Jacobs*, *see* TRAX's Mot. to Suppl. the Administrative Record, No. 16-1602C, ECF No. 55, is DENIED as moot.

injunctive and declaratory relief is DENIED.  The clerk is directed to enter judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge